**Dan L. SPRINGATE, individually as a devisee of the Will of Fred E. Springate, deceased and as Executor of the Estate of Fred E. Springate, Plaintiff,**

v.

**WEIGHMASTERS MURPHY, INC. MONEY PURCHASE PENSION PLAN, Charles E. Murphy, John E. Murphy, Frank Murphy, and Northern Trust Bank of California, N.A., Defendants.**

No. CIV.01–03551 DT.

United States District Court, C.D. California.

June 3, 2002.

---

Gary C. Nawa, Gary C. Nawa Law Offices, Ronald M. LaBran, Zeutzius & LaBran Law Offices, Pasadena, CA, for Plaintiff.

E. W. Sheridan, E. W. Sheridan Law Offices, Long Beach, CA, Joseph C. Faucher, Reish Luftman McDaniel & Reicher, Los Angeles, CA, for Defendants.

ORDER **DENYING** DEFENDANTS WEIGHMASTERS MURPHY, INC. MONEY PURCHASE PENSION PLAN, CHARLES E. MURPHY, JOHN E. MURPHY AND FRANK MURPHY'S MOTION TO DISMISS; **GRANTING IN PART** DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS; AND **GRANTING** PLAINTIFF DAN L. SPRINGATE'S MOTION FOR SUMMARY JUDGMENT

TEVRIZIAN, District Judge.

## *DEFENDANTS' MOTION TO DISMISS*

### I. *Background*

#### A. **Factual Summary**

This action is brought by Plaintiff Dan L. Springate ("Plaintiff") individually as a devisee of the Will of Fred E. Springate and as Executor of the Estate of Fred E. Springate against Defendants Weighmasters Murphy, Inc. Money Purchase Pension Plan, Charles E. Murphy, individually and as administrator of the estate, John E. Murphy, Frank Murphy and Northern Trust Bank of California, N.A. (collectively, "Defendants") for violation of the Employee Retirement Income Security Act of 1974 ("ERISA")—29 U.S.C. §§ 1104, 1105, and 1132.

The following facts are alleged in the Complaint:

Decedent, Elinora M. Murphy, was a participant in the Weighmasters Murphy, Inc. Money Purchase Pension Plan ("Plan"). (Complaint ¶ 7.) In her application to the Plan, she properly designated Fred Springate as her Named Beneficiary in conformance with the provisions of the Plan. (*Id.* at ¶ 10.) Ms. Murphy's interest in the Plan ($1,555,317) was 100% vested at the time of her death on May 3, 1999. (*Id.* at ¶ 9.) As a consequence of this designation, Ms. Murphy's vested interest should have been immediately transferred to Fred Springate upon her death. (*Id.* at ¶ 10.) Despite repeated demands, each defendant failed and refused to transfer the funds to Fred Springate as required by the Plan and ERISA. (*Id.* at ¶ 11.)

At the time of Ms. Murphy's death, the Plan was invested approximately as follows: 7% in cash, 37% in a security listed as "MFB NORTHN INSTL FDS DIVERSIFIED GROWTH PORTFOLIO CL A", and 55% in the common stock of UNUMPROVIDENT Corporation. (*Id.* at ¶ 12.) Each defendant failed and refused to diversify the assets and holdings of the Plan. (*Id.* at ¶ 13.) In addition, each defendant retained ownership of UNUMPROVIDENT common shares during this period with the specific intent of reducing the value of Ms. Murphy's interest in the Plan to cause Fred Springate financial harm. (*Id.* at ¶ 15.) These actions violated each defendant's duty of undivided loyalty to the Plan's participants and beneficiaries. (*Id.*)

On January 21, 1994, Northern Trust Bank accepted the position of "Trustee" of the Plan. (*Id.* at ¶ 17.) Although labeled a "Directed Trustee" by Article Seven of the Plan and the title of the document, to wit: "Directed Trust for Defined Benefit or Defined Contribution Plans", Article Four of the Trust Agreement reserves for Northern Trust Bank the right to buy, sell, invest, lease or otherwise exercise control over each and every assets of the Plan. (*Id.*) In addition, on December 13, 1999, Northern Trust Bank filed a "Complaint in Intervention [sic]" in the United States District Court for the Central District of California, action No. 99–13044 DT (Ctx). (*Id.* at ¶ 18.) These acts by Northern Trust Bank were not acts of a directed trustee, but rather were acts of an independent trustee. (*Id.*)

On March 7, 2000, Northern Trust Bank was dismissed from the Interpleader action it had filed. (*Id.* at ¶ 19.) On May 31, 2000, Northern Trust Bank deposited the entirety of Ms. Murphy's vested interest in the Plan, the sum of $915,410.09, with the United States District Court. (*Id.*)

As a result of its acts, Northern Trust Bank caused the value of Ms. Murphy's vested interest in the Plan to decrease by approximately $630,000, in the space of one year and 28 days. (*Id.* at ¶ 20.)

On June 27, 2000, Fred Springate died. (*Id.* at ¶ 22.) On October 27, 2000, Dan Springate was appointed the Executor of the Estate of Fred Springate by the Probate Department of the Superior Court of the State of California for the County of Los Angeles. (*Id.*) Dan Springate is also the son and one of the heirs of Fred Springate. (*Id.*)

Plaintiff alleges the following claims for relief in the Complaint:

1. First Claim: recovery of pension benefits due the beneficiary of a plan participant in violation of 29 U.S.C. § 1132(a)(1)(B), ERISA § 502(a)(1)(B), and 29 U.S.C. § 1104(a), ERISA § 404(a);

2. Second Claim: losses caused by failure to diversify plan assets in violation of 29 U.S.C. § 1104(a)(1)(C), ERISA § 404(a)(1)(C);

3. Third Claim: participation in or allowing co-fiduciaries breach of fiduciary obligations and responsibilities in violation of 29 U.S.C. § 1105, ERISA § 405;

4. Fourth Claim: injunction enjoining Investment Committee only, from acting in any fiduciary capacity in the future under 29 U.S.C. § 1111(a), ERISA § 411(a);

5. Fifth Claim: claim for attorneys fees pursuant to 29 U.S.C. § 1132(g)(1), ERISA § 502(g)(1).

**B. Procedural Summary**

On April 18, 2001, Plaintiff filed the Complaint.

On April 18, 2001, Plaintiff filed a Notice of Pendency of Other Action pending in the Court of Appeal for the State of California, Second Appellate District, Appeal No. B 143 213, entitled "Eleanor M. Murphy, aka Eleanor Marie Murphy Estate, Defendant and Appellant, vs. Fred E. Springate, Plaintiff and Respondent" regarding the Probate Action concerning the ownership rights of the decedent's vested interest in the Plan.

On May 8, 2001, Defendants Weighmasters Murphy, Inc. Money Purchase Pension Plan, Charles Murphy, John Murphy, and Frank Murphy filed an Answer to the Complaint.

On May 15, 2001, this Court issued its Order Setting a Scheduling Conference for July 23, 2001.

On May 18, 2001, this Court issued its Standing Order with Regard to Newly Assigned Cases.

On May 29, 2001, Defendant Northern Trust Bank filed a Request for Judicial Notice in Support of its Motion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.

On May 29, 2001, Defendant Northern Trust Bank filed a Motion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.

On May 30, 2001, Defendants Weighmasters Murphy, Inc. Money Purchase Pension Plan, Charles Murphy, John Murphy, and Frank Murphy filed a Stipulation to File First Amended Answer to the Complaint.

On June 4, 2001, Defendants Weighmasters Murphy, Inc. Money Purchase Pension Plan, Charles Murphy, John Murphy,

and Frank Murphy filed a First Amended Answer to the Complaint.

On June 11, 2001, Plaintiff filed a Request for Judicial Notice in Opposition to Defendant Northern Trust Bank of California N.A.'s Motion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.

On June 22, 2001, Plaintiff filed a Request for Judicial Notice in Support of Motion to Strike and Motion to Dismiss Portions of the First Amended Answer of Defendants, Weighmasters Murphy, Inc. Money Purchase Pension Plan, Charles Murphy, John Murphy, and Frank Murphy.

On June 22, 2001, Plaintiff filed a Motion to Strike Portions of the First Amended Answer of Defendants, Weighmasters Murphy, Inc. Money Purchase Pension Plan, Charles Murphy, John Murphy, and Frank Murphy, and Motion to Strike or Dismiss Request for Offset/Counterclaim of said Defendants.

On June 26, 2001, this Court entered an Order Granting Plaintiff's Request for Judicial Notice in Opposition to Defendant Northern Trust Bank's Motion to Dismiss; entered an Order Granting Defendant Northern Trust Bank's Request for Judicial Notice in Support of Motion to Dismiss; and entered an Order Granting With Prejudice and Without Leave to Amend Defendant Northern Trust Bank's Motion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.

On July 23, 2001, this Court filed an Order Granting With Prejudice Plaintiff's Motion to Strike Portions of Defendants' First Amended Answer and Denying Plaintiff's Motion to Dismiss or Strike Defendants' Request for Offset/Counterclaim But Ordering a More Definite Statement of Counterclaim.

On July 26, 2001, Defendants filed an Amended Counterclaim.

On August 20, 2001, Plaintiff filed a Motion to Dismiss Amended Counterclaim for Failure to State a Claim Upon Which Relief Can Be Granted and a Motion to Strike or for a More Definite Statement.

On September 18, 2001, this Court entered an Order Sua Sponte Granting a Motion to Dismiss Amended Counterclaim for Lack of Subject Matter Jurisdiction Pursuant to Federal Rules of Civil Procedure 12(b)(1); Granting Dan Springate's Request for Judicial Notice; Denying As Moot Plaintiff's Motion to Dismiss Amended Counterclaim for Failure to State a Claim Upon Which Relief Can be Granted and Denying as Moot Plaintiff's Motion to Strike or for a More Definite Statement.

On November 9, 2001, a Notice of Dismissal by Plaintiff was filed, dismissing Defendant Northern Trust Bank of California.

On April 1, 2002, this Court ordered the pre-trial conference and trial setting continued to July 8, 2002.

On April 22, 2001, Plaintiff filed a Motion for Summary Judgment or Summary Adjudication of Issues, which is currently before this Court.

On May 1, 2002, Defendants Weighmasters Murphy Inc., Money Purchase Pension Plan, Charles E. Murphy, John E. Murphy and Frank Murphy filed a Motion to Dismiss, which is also before this Court.

## II. *Discussion*

### A. *Defendants' Request for Judicial Notice*

Defendants ask this Court to take judicial notice, pursuant to Federal Rule of Evidence 201, of the following documents: (1) Complaint in Interpleader in U.S. District Court Case No. 99–13044 DT (CTx)

filed December 13, 1999; (2) Answer of Springate filed January 5, 2000; (3) Order of Dismissal in Case No. 99–13044 DT (CTx) entered March 7, 2000; (4) Plaintiff's Exhibits 1 through 63; (5) Deposition of Frank Murphy taken December 21, 2001, Exhibit 54; (6) Deposition of John Murphy taken December 21, 2001, Exhibit 53; (7) Deposition of Charles Murphy taken December 28, 2001, Exhibit 52; (8) Deposition of Linda M. Podhorski taken February 22, 2002, Exhibit 55; and (9) Deposition of Lynne T. Norwich taken February 12, 2002, Exhibit 59.

A court must take judicial notice if a party requests it and supplies the court with the requisite information. Fed. R.Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

 This Court may take judicial notice of its own records, and documents that are public records and capable of accurate and ready confirmation by sources that cannot reasonably be questioned. *See MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986) (courts may take judicial notice of matters of public record outside the pleadings); *United States v. Wilson,* 631 F.2d 118, 119 (9th Cir. 1980)("In particular, a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases.") Documents whose contents are alleged in a complaint and whose authenticity is not in question may be considered in a motion to dismiss. *See Branch v. Tunnell,* 14 F.3d 449, 453–54 (9th Cir.1994).

For purposes of this Motion to Dismiss, this Court takes judicial notice of documents (1) and (2) only because these documents' contents are alleged in the Complaint, and their authenticity is not in question. However, this Court declines to take judicial notice of the remaining documents because to do so would require this Court to convert this motion to one for summary judgment. Moreover, Defendants do not rely on these documents in support of this instant motion to dismiss; rather, they rely on these documents in opposition to Plaintiff's Motion for Summary Judgment, which is explained below. As such, this Court grants in part Defendants' request in accordance with the above.

### B. *Standard*

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) the Court must assume that plaintiffs' allegations are true, and must construe plaintiffs' complaint in the light most favorable to plaintiffs. *See United States v. City of Redwood City,* 640 F.2d 963, 967 (9th Cir. 1981). Moreover, even if the face of the pleadings indicates that recovery is unlikely, the plaintiff is still entitled to offer evidence in support of the complaint. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Redwood City,* 640 F.2d at 967. Finally, a court may not dismiss complaints pursuant to Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980).

Generally, orders granting motions to dismiss are without prejudice unless "allegations of other facts consistent with the challenged pleading could not possibly cure the defect." *Schreiber Dist. v. Serv-Well Furniture,* 806 F.2d 1393, 1401 (9th Cir.1986).

## C. *Analysis*

### 1. Res judicata does not bar Plaintiff's claims against Defendants

Defendants argue that the original action, *Northern Trust Bank of California v. Murphy,* Case No. CV 99–13044 DT ("Interpleader Action"), acts as res judicata to the claims presented in this action.

 "In order to bar a later suit under the doctrine of res judicata, an adjudication must (1) involve the same 'claim' as the later suit, (2) have reached a final judgment on the merits, and (3) involve the same parties or their privies." *Nordhorn v. Ladish Co., Inc.,* 9 F.3d 1402, 1404 (9th Cir.1993).

Defendants contend that the Interpleader Action involves the same claims as the current action. Plaintiff responds that the claims at issue in this action have never been litigated. This Court agrees with Plaintiff.

 The following criteria are considered to determine whether two claims are the same for purposes of res judicata: (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. *See id.* Applying these criteria, it is clear that the Interpleader Action and this action do not involve the same claims. In the Interpleader Action, the issue was who had the legal rights to Ms. Murphy's Plan assets. Here, the issue is whether Defendants breached their fiduciary duties, causing a decline in the value of Ms. Murphy's vested interest in the Plan. Contrary to Defendants' asser-

tions, this action does not concern "the legal rights to Eleanor Murphy's Plan assets." As such, no rights or interests established in the Interpleader Action would be destroyed or impaired by prosecution of this action. In addition, the evidence in this action will not be substantially the same as the evidence presented in the Interpleader Action, and this action arises out of a different set of facts. Thus, because this Court finds that this action does not involve the same claims as the Interpleader Action, this Court finds that res judicata does not bar this action.[1]

### 2. This action is not barred by the compulsory counterclaim rule

 Defendants further argue that Federal Rule of Civil Procedure 13(a) precludes the present claims. Rule 13(a) governs counterclaims and makes joinder of counterclaims compulsory if they arise out of the same transaction or occurrence of the opposing party's claim. Defendants specifically argue that Plaintiff's claims here should have been raised by counterclaim in the Interpleader Action because they arose out of the same transaction or occurrence. However, as explained above, Plaintiff's claims in the present action do not arise out of the same transaction or occurrence as those in the Interpleader Action. The Interpleader Action dealt solely with determining who was entitled to the funds held by Northern Trust. No issue as to the value of Decedent's vested interest or Defendants' breaches of their fiduciary duties was ever raised or known to the parties at that time. As such, this Court finds that Rule 13(a) does not preclude the claims in the present action.

Defendants similarly argue that the present claims are barred for failure to file a compulsory cross-complaint to the Inter-

---

1. This Court does not need to reach the further factors of whether there was a final judg- ment on the merits and whether the actions have the same parties or their privies.

pleader Action. They rely on the case of *Cheiker v. Prudential Ins. Co. of America*, 820 F.2d 334 (9th Cir.1987). However, this argument by Defendants is the same argument made above. In *Cheiker*, the Court applied California's compulsory cross-complaint statute. Significantly, it noted that California's compulsory cross-complaint statute parallels the compulsory counterclaim statute of Rule 13(a). *See id.* at 337. As such, Defendants' argument has no merit.[2]

### 3. The doctrine of "custodia legis" does not bar Plaintiff's claims

■ Defendants argue that "the doctrine of custodia legis bars any claim by [Plaintiff]." Apparently, they contend that Defendants could not have done anything with the Plan "without the order or approval of the Federal Court." Defendants make this argument without any legal support. In any event, it is without merit. "In custodia legis" references property taken into the Court's charge during pending litigation over it. While it is true that the interpled funds were "in custodia legis," none of the claims by Plaintiff here relies on any action taken by Defendants during this time. Rather, Plaintiff challenges Defendants' actions, or lack thereof, prior to the time the funds were deposited with this Court.

### 4. Defendants cannot rely on the argument that they delegated all authority to Northern Trust

■ Defendants argue that they delegated all authority to Northern Trust as Trustee and PFPC as Third Party Administrator to exclusively administer the Plan. They conclude that as a result, no liability

is binding on them. Plaintiff responds that this Court has already determined this issue through its Order of June 26, 2001, wherein this Court dismissed Northern Trust from this action with prejudice. This Court agrees.

In this action, Plaintiff sued Northern Trust on the theory that Northern Trust exercised control over the Plan's assets because it decided when and what to sell of the Plan's assets. In the June 26, 2001 Order, this Court disagreed and granted Northern Trust's Motion to Dismiss with prejudice. This Court found that Northern Trust was a directed trustee, which did not have the power to determine where Plan assets should be invested and did not have a fiduciary duty to review the appropriateness of Plan investments. (*See* June 26, 2001 Order, pp. 11–12.) This Court held as follows:

> In sum, according to the Plan and the Directed Trust Agreement, Defendant does not have the power or responsibility to determine or monitor where Plan assets are invested. As a result, Defendant has no fiduciary duty to diversify Plan assets.

(*See id.* at p. 15.) In light of this finding, Defendants cannot presently argue that they have no liability because they "delegated all authority to Northern Trust." Because Northern Trust was a directed trustee, it could not, by definition, control the assets of the Plan. Furthermore, Defendants' argument totally ignores the affirmative duties imposed upon them as fiduciaries. *See* 29 U.S.C. § 1104(a). "Contrary to appellee's contentions, this is not a search for subjective good faith—a pure heart and an empty head are not

---

2. This Court notes that Defendants' res judicata and compulsory counterclaim arguments mirror those made by this Court in its order dismissing Northern Trust with prejudice. However, this Court's analysis in said Order was applicable to Northern Trust only, be-

cause Northern Trust, as Plaintiff in Interpleader, was dismissed from the Interpleader Action and was "discharged from any further liabilities as to the claim of Defendants." A similar analysis cannot be made here with respect to Defendants.

enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983).

### 5. Defendants are being sued in their capacities as fiduciaries

■ Defendants argue that because they are employers, they are not proper parties to be sued herein. However, Defendants are not being sued for recovery of Ms. Murphy's vested interest in the Plan. Rather, they are being sued in their capacities as Named Fiduciaries of the Plan, and as such, the claims are proper against them. Defendants' arguments are therefore inapplicable.

Defendants also argue that Plaintiff's causes of action are proper against the Plan only. However, 29 U.S.C. § 1109 specifically imposes personal liability on a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter." In addition, Section 1132(a)(3) specifically provides that a participant or beneficiary may bring a civil action to "(B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." Defendants appear to argue that because only equitable relief is available to Plaintiff, his claims are barred. This Court agrees, and Plaintiff does not dispute, that he cannot seek damages against Defendants for their fiduciary breaches. Nonetheless, to the extent that Plaintiff seeks equitable relief, his claims against Defendants as fiduciaries are proper. *See Varity Corp. v. Howe*, 516 U.S. 489, 491, 116 S.Ct. 1065, 1067, 134 L.Ed.2d 130 (1996) ("ERISA § 502(a)(3) authorizes

lawsuits for individualized equitable relief for breach of fiduciary obligations.")

### D. Conclusion

This Court has examined each of Defendants' asserted bases for dismissal of Plaintiff's claims and finds that each lacks merit. Accordingly, this Court **denies** Defendants' Motion to Dismiss.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I. Background

#### A. Defendants' Opposition to the Instant Motion

In opposition to this Motion for Summary Judgment, Defendants filed a "Reply to Plaintiff Dan L. Springate's Motion for Summary Judgment," wherein Defendants incorporated by reference their Motion to Dismiss. Defendants did not separately file an opposition to this motion. Rather, "by reference [to the motion to dismiss] said Defendants and each of them deny each and every claim set forth in Plaintiffs' Motion for Summary Judgment and request entry of an Order Granting the Motion to Dismiss with Prejudice and without leave to amend."

This Court has addressed each of Defendants' arguments above and finds that they lack merit. As such, this Court does not address these arguments again herein. Instead, this Court addresses Plaintiff's arguments and whether they support summary judgment in his favor.

#### B. Factual Summary

The following facts are undisputed [3]:

---

**3.** Local Rule 56–3 provides as follows:

In determining any motion for summary judgment, the Court will assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Issues'

and (b) controverted by declaration or other written evidence filed in opposition to the motion.

Defendants failed to submit a Statement of Genuine Issues of Material Fact as required by Local Rule 56–2. As such, this Court finds that the material facts as claimed are admit-

## 1. Plan Sponsor identification

Weighmasters Murphy, Inc. was the Plan Sponsor for Weighmasters Murphy, Inc. Money Purchase Plan ("Plan"). The Plan is a pension plan established pursuant to the Employees Retirement Income Security Act of 1974 ("ERISA"). The Administrative Committee is appointed by Weighmasters Murphy, Inc.

## 2. The family relationships, composition of the Board of Directors and the Administrative Committee

Eleanor Murphy ("Eleanor") died on May 3, 1999. Defendants Charles Murphy ("Charles") and John Murphy ("John") are Eleanor's brothers. Defendant Frank Murphy ("Frank") is the son of Charles and the nephew of Eleanor. At all times relevant to this action, Charles, John and Frank were the sole members of the Board of Directors of Weighmasters Murphy, Inc. From November 1990 through the present time, Charles and John were members of the Administrative Committee of the Plan. When Eleanor died, Charles appointed Frank to the Administrative Committee. At all times relevant hereto, Charles, John and Frank were the "Named Fiduciaries" of the Plan.

## 3. What the Plan requires of the fiduciaries

The Plan requires the following of the fiduciaries:

"Each fiduciary of the Plan shall discharge the Fiduciary's duties solely in the interests of the Participants and their Beneficiaries."

"Each fiduciary of the Plan shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conducting an enter-

ted to exist without controversy as long as

prise of like character and with like aims."

"Fiduciaries shall diversify Plan assets to minimize risk of large losses, unless under the circumstances it is clearly prudent not to do so."

## 4. What the fiduciaries did not know about their duties and obligations as fiduciaries

Charles does not know the meaning of the word "fiduciary." Charles did not understand the Plan when he read it. Charles never read the entire Plan document. Charles does not know the meaning of the word "trustee" and never made any inquiries as to what his role as a trustee was. Charles does not know the meaning of the words "plan participant." Charles does not know the meaning of the words "plan beneficiary." Charles does not know the meaning of the expression "party in interest." Charles does not know the meaning of the expression "exclusive benefit rule." Charles does not know the meaning of the expression "plan year." Charles does not know the meaning of the expression "plan asset." Charles does not know the meaning of the expression "a prudent man." Charles does not know the meaning of the expression "a prudent fiduciary." Charles does not know the meaning of the expression "diversification of assets." Charles does not know the meaning of the acronym "ERISA."

Frank does not know the meaning of the word "fiduciary." Frank does not know the meaning of the word "trustee." Frank does not know the meaning of the words "plan participant." Frank does not know the meaning of the words "plan beneficiary." Frank does not know the meaning of the expression "party in interest." Frank does not know the meaning of the expression "prohibited transaction." Frank does

they are adequately supported.

not know the meaning of the expression "exclusive benefit rule." Frank does not know the meaning of the expression "plan year." Frank does not know the meaning of the expression "plan asset." Frank does not know the meaning of the expression "a prudent man" as applied to the obligations of a trustee. Frank does not know the meaning of the expression "a prudent fiduciary" as applied to a trust of any type. Frank does not know the meaning of the expression "diversification of assets." Frank is not familiar with the expression "ERISA." Frank has not taken any steps to educate himself as to the role of a fiduciary. Frank does not know if he read the Plan. Frank does not know the meaning of the expression "plan sponsor." Frank is the Secretary Treasurer of Weighmasters Murphy, Inc. Frank does not know the source of funding for the Plan.

John defines "trustee" as "somebody who is responsible." John states that within the context of a pension plan, the "trustee" is only responsible for choosing someone to handle the responsibility and money. John has been a "trustee" only once. John was a "trustee" for his brother's estate. John defines "fiduciary" within the context of a pension plan as meaning that "you will be faithful in seeing that the assets are in good hands and administered well . . . ." John cannot properly define the expression "plan participant." John has not read the Plan document. John is not familiar with the expression "party in interest." John defines the expression "prohibited transaction" as "not filing the papers correctly." John is not familiar with the expression "exclusive benefit rule." The named fiduciaries did not consult with a financial advisor concerning any aspect of the Plan assets. John has taken no steps to ensure that he had a proper level of knowledge when attempting to act as a Named Fiduciary. John does not have any understanding of the expression "prudent man" within the context of a pension plan. John contends that as a Named Fiduciary he does not have any responsibility for the monitoring whomever he hired to insure they were diversifying the Plan's assets. John contends that as a Named Fiduciary he had no obligation to do anything with regard to the assets of the Plan. John does not have an understanding of the expression "independent trustee." John is not familiar with the expression "named beneficiary." John is not familiar with, and has no understanding of, the expression "named fiduciary." Until the time of his deposition, John did not understand that one of his obligations was to tell the trustee "how to invest Plan assets."

5. **What the Defendant fiduciaries did not know concerning the composition and value of the Plan's assets**

Charles was never aware that the Plan owned stock in UNUM Corporation. Charles never knew UNUM's stock price. The value of the Plan assets declined after Eleanor's death. Charles took no steps to interrupt the decline in value of the Plan's assets. Charles did nothing to determine the value of Eleanor's interest in the Plan at the time of Eleanor's death. Eleanor's interest in the Plan dropped 40% in the 14 months after her death. Charles does not know if any participant, other than Eleanor, sustained a 40% decline in the same period of time. Charles does not know why Eleanor's interest in the Plan dropped from over $1.5 million to $915,000.00 in the 14 months following her death. Charles never found out why Eleanor's interest in the Plan dropped from over $1.5 million to $915,000.00 in the 14 months following her death. Charles does not know the value of the Plan's assets for any year in which he was a Named Fiduciary. Charles does not know the composition of the assets of the

Plan for any year in which he was a named Fiduciary. Despite the fact that he had no experience in investing in the stock market, Charles never consulted with a financial advisor to determine if any asset owned by the Plan was an appropriate asset to be owned by a pension plan. Charles never consulted with a financial advisor about the Plan's assets at all. Charles did not know what assets the Plan held as of May 31, 1999, the end of the Plan year in which Eleanor died. Charles did not know the value of any individual asset held by the Plan on May 31, 1999, the end of the Plan year in which Eleanor died. Charles never took any steps to inform himself as to what assets the Plan held as of May 31, 1999. Charles never took any steps to inform himself as to what assets the Plan held at any time. On June 28, 2000, Northern Trust wrote to Charles and set forth the share price and value of UNUM's stock at the end of each quarter of the Plan's fiscal year from May 31, 1998, through February 29, 2000, except the quarter ending November 30, 1999. Charles was never aware that the Plan owned 22,852 shares of UNUM stock. Charles does not know what UNUM does. Charles did not know that UNUM's stock price had dropped from $55.5625 per share on May 31, 1998, to $13.375 per share on February 29, 2000. Charles did not know that UNUM's stock price had been reduced by 80% between May 31, 19998 and February 29, 2000. Charles does not know what an "asset" is.

Frank does not know the composition of the Plan's assets. Frank does not know what types of assets a Plan may hold under ERISA. Frank does not know what types of assets a Plan may not hold under ERISA. Frank never took any steps to determine what the Plan's money was invested in, whether it was stocks, bonds, cash or anything else. Frank never consulted with a financial advisor concerning what types of assets and investments were appropriate for a plan to hold. Since becoming a Named Fiduciary in May 1999, Frank has done nothing to fulfill his obligations he may have had except attend one or two meetings of the Committee. Frank has never known what the assets of the Plan consisted of. Frank does not know if the Plan ever owned UNUM stock. Frank never reviewed the performance of UNUM stock to determine if it was an appropriate investment for the Plan. Frank never knew the Plan owned 22,852 shares of UNUM stock. Frank does not know what "MFB NORTHRN INSTL FDS Diversified Growth Portfolio" is.

John is not aware of any Named Fiduciary consulting with a financial advisor. John has taken no steps to ensure that he fulfills his fiduciary duties. John never understood until his deposition that it was his obligation to tell the trustee how to invest Plan assets. John does not know who was responsible for choosing the Plan's assets since May of 1999. John never chose any asset to be owned by the Plan. John does not know the value of the assets held by the Plan at the end of the 1999 Plan year. John does not know the value of the assets held by the Plan at the end of the 2000 Plan year. John does not know the composition of the Plan assets at the 1999 Plan year end. John does not the composition of the Plan's assets in the 2000 Plan year end. John does not know if the assets owned by the Plan were appropriate investments. John never investigated UNUM stock at all. John never concerned himself with what assets were in the Plan. As a Named Fiduciary, John did nothing to minimize the losses suffered by the Plan and its Participants. John had previously retired from Weighmasters Murphy, Inc. and received his interest in the Plan in a lump sum distribution. John never reviewed the investments made by the Plan. John never reviewed the investment returns or losses made by the Plan's

assets. John admits he is not competent to choose stocks for the Plan. John never consulted with anyone concerning how to properly run or administer the Plan. John never paid attention to whether the Plan's investments were going up or down in value. John did nothing to determine if UNUM stock was an appropriate investment of Plan assets. The Plan's investment in UNUM stock constituted of two thirds of the Plan's assets. John did nothing to determine if it was appropriate to keep two thirds of the Plan's assets in UNUM stock. John does not know what MFB NORTHRN INSTL Diversified Growth Portfolio is. John did not know the Plan owned over 30,000 shares of MFB NORTHRN INSTL Diversified Growth Portfolio. John took no steps as a Named Fiduciary to determine if the Diversified Growth Portfolio was a wise investment of Plan Assets. John never looked at the Plan's assets in 1999 or 2000 to determine why their value was dropping. John was not aware that UNUM stock dropped from $55.00 per share to $13.00 per share between May 31, 1999 and February 29, 2000. John concedes that it was not prudent to "ride it [the UNUM stock] down" 75%. John never thought that in order to protect the Plan participants and beneficiaries, the Named Fiduciaries should sell the UNUM stock and invest in something else.

### 6. Defendants' status as parties in interest and conflicted fiduciaries

Charles is Eleanor's brother. John is Eleanor's brother. Frank is the son of Charles and the nephew of Eleanor. Charles is to inherit 1/7 of Eleanor's Estate. John is to inherit 1/7 of Eleanor's Estate. Charles did not want Fred Springate to get Eleanor's interest in the Plan. Charles wanted Eleanor's interest in the Plan to go to himself and his family members. Under the Plan, "party-in-interest" shall mean any person or other entity de-fined as a party-in-interest in Section 3(14) of ERISA. Section 16.7 of the Plan provides as follows:

> (c) Except as otherwise allowed by law or provided in this Plan, a Fiduciary shall not cause the Plan to engage in a transaction if such transaction is not exempt from the prohibited transaction rules of ERISA and if the Fiduciary knows or should know that such a transaction constitutes a direct or indirect:
>
> . . . . .
>
> (4) Transfer to, or use by or for the benefit of, a Party-in-interest, of any assets of the Plan; ....
>
> (d) Except as otherwise allowed by law or provided in this Plan, a Fiduciary shall not:
>
> . . . . .
>
> (1) Deal with the assets of the Plan in the Fiduciary's own interest or for the Fiduciary's own account; ....
>
> (2) In the fiduciary, individual or in any other capacity, act in any transaction involving the Plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the Plan or the interests of the Plan's Participants or Beneficiaries; ....

Defendants, and each of them, failed and refused to honor the Named Beneficiary designation executed by Eleanor on February 14, 1980. Defendants, and each of them, refused to release Eleanor's vested interest in the Plan in the amount of $1,555,317.42.

### 7. The admitted value of Eleanor's interest in the Plan

Eleanor's interest in the Plan was 100% vested at the time of her death on May 3, 1999. Eleanor's fully vested interest in the Plan was $1,555,317.42. Eleanor's interest in the Plan on May 31, 2000 had

declined to $915,410.00 when her interest in the Plan was deposited in the Court.

### 8. Improper payment of Plan expenses From Eleanor's individual interest in the Plan

Section 6.5 of the Plan provides:

The Committee may, in its discretion, employ agents, brokers, attorneys (including attorneys for the Employer), accountants, investment counsel, or such other assistants as it may deem proper to discharge its responsibilities, and the Employer agrees to pay all fees and expenses incurred in connection therewith. However, such fee may be paid by the Trustee upon written direction of the Committee.

Northern Trust Bank of California, N.A. ("Northern Trust") was, at all times relevant hereto, a Directed Trustee of the Plan. Northern Trust retained the Law Firm of Reisch & Luftman to provide legal advice to it and the Plan concerning the competing instructions to Northern Trust received as to who should receive the distribution of Eleanor's interest in the Plan. Northern Trust incurred legal bills with the Law Firm of Reisch & Luftman in the amount of $12,992.54. The Plan Sponsor, Weighmasters Murphy, Inc., was responsible for payment of the legal bills incurred by Northern Trust. PFPC, Inc. was the third party administrator for the Plan. PFPC, Inc. was the successor to U.S. Pension and assumed its responsibilities under the Plan Services Agreement, dated March 23, 1998. Charles directed PFPC, Inc. to allocate "[T]he legal fee of $12,992.54" to "Eleanor Murphy's portion of the money purchase pension plan" on January 16, 2001. The sum of $12,992.54 was deducted from Eleanor's interest in the Plan. Northern Trust deposited the sum of $915,410.09 with the United States District Court for the Central District of California on or about May 30, 2000. The sum of $915,410.09 represented the deduction of the sum of $12,992.54 to pay for Northern Trust's legal bills with Reisch & Luftman.

### 9. Eleanor's designation of beneficiary

On or about February 14, 1980, Eleanor designated Fred Springate as the Beneficiary of her vested interest in the Plan in the event of Eleanor's death. Charles was given a copy of the Application for Participation about a week after Eleanor's death. Charles testified that the signature on the Application for Participation was Eleanor's. John testified that the signature on the Application for Participation was Eleanor's. The Superior Court for the State of California for the County of Los Angeles, in action number NP 007500, determined that the Application for Participation was valid Designation of Beneficiary.

### 10. Admissions in Defendants' First Amended Answer

As of the time of Eleanor's death, 55% of the Plan's assets were invested in the common stock of UNUM Provident Corporation. As of the time of Eleanor's death, 37% of the Plan's assets were invested in a security known as "MFB NORTHRN INSTL FDS Diversified Growth Portfolio CL A."

### 11. The value of the Plan's assets

At Plan year end, May 31, 1999, the assets of the Plan totaled $1,875,372.85. At Plan year end, May 31, 2000, the assets of the Plan totaled $1,105,371.34.

### 12. Court Rulings

This Court has already ruled that Northern Trust was a Directed Trustee and as a Directed Trustee, Northern Trust had no power to determine where Plan assets should be invested. The Superior Court in the Probate Action determined, in conformance with 29 U.S.C. 1132(E),

ERISA 5023(e), that the Beneficiary Designation/Statement executed by Eleanor in favor of Fred was valid. The rulings set forth in Exhibits 60 and 63 have been affirmed by the Court of Appeal of the State of California in an unpublished opinion.

## II. *Discussion*

### A. *Standard*

Under the Federal Rules of Civil Procedure, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *See id.;* Fed.R.Civ.P. 56(e).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511. The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, mere

disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. *See Harper v. Wallingford,* 877 F.2d 728 (9th Cir.1989); *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987).

If the moving party seeks summary judgment on a claim or defense on which it bears the burden of proof at trial, it must satisfy its burden by showing affirmative, admissible evidence.

Unauthenticated documents cannot be considered on a motion for summary judgment. *See Hal Roach Studios v. Richard Feiner and Co.,* 896 F.2d 1542, 1550 (9th Cir.1989).

On a motion for summary judgment, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. *See* Fed.R.Civ.P. 56(e). Declarations on "information and belief" are inappropriate to demonstrate a genuine issue of fact. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

### B. *Analysis*

Plaintiff seeks summary judgment with respect to their claims for relief.

### 1. Defendants breached their fiduciary duties

Congress enacted ERISA to protect the interests of participants and their beneficiaries from abuses in the administration and investment of private retirement plans and employee welfare plans. ERISA's purpose is effectuated by its provisions establishing standards of conduct, responsibility and obligation for fiduciaries and by providing appropriate remedies, sanctions and ready access to the courts for

plan participants and their beneficiaries who are wrongfully denied benefits. *See* 29 U.S.C. § 1001(b). To this end, Congress enacted ERISA provisions requiring that all assets of an employee benefit plan be held in a trust by one or more trustees (*see id.* at § 1103(a)), each of whom is a fiduciary (*see id.* at § 1002(21)(a)), subject to comprehensive standards of conduct (*see id.* at §§ 1104–1113). ERISA dictates that every plan fiduciary shall discharge his duties with respect to the plan, "solely in the interest of the participants and beneficiaries" and with the "care, skill, prudence, and diligence" that a prudent person "familiar with such matter" would use when acting under similar circumstances. *See id.* at § 1104(a)(1).

Specifically, Section 1104(a) provides as follows in pertinent part:

(a) Prudent Man Standard of Care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

This "prudent person test" requires the court to consider whether the trustee, at the time they engaged in the challenged transaction, employed the appropriate methods to investigate the merits of the investment and to structure the investment. *See Donovan v. Mazzola,* 716 F.2d 1226, 1232 (9th Cir.1983).

Plaintiff argues that Defendants did not make any effort to fulfill any of the fiduciary duties ERISA imposed upon them. Based on the undisputed facts, this Court agrees. To begin with, Defendants admit that they had no idea what their duties as fiduciaries were, what assets the Plan owned, what the assets were worth, whether it was prudent to own the assets, or whether they should own the two stocks which compromised more than 93% of the Plan's assets. (*See* Charles Depo., pp. 46, 50–54, 56, 59, 64, 72–73, 75–76, 84, 92, 100–101, 123–24, 130–31; Frank Depo., pp. 14–18, 21–22, 27, 31, 33, 35, 39–41; John Depo., pp. 19–33, 37, 41–44, 49–53, 86, 91, 94, 97, 101–10109, 120, 131, 134.) Indeed, Defendants conducted no independent investigation at all. *See In Re Unisys Sav. Plan Litigation,* 74 F.3d 420, 435 (3d Cir. 1996) ("We begin with the most basic of ERISA's investment fiduciary duties, the duty to conduct an independent investigation into the merits of a particular investment.") Defendants themselves proclaim that they conducted no investigation. As such, no inquiry needs to be made whether Defendants conducted a *proper* investigation. Defendants never even determined what assets the Plan owned or what the assets were worth at any time. This Court concludes that such admissions evidence breaches of Defendants' fiduciary obligations.

Plaintiff further argues that Defendants breached their fiduciary duties by failing

to diversify the Plan's assets. This Court agrees.

ERISA's duty to diversify prohibits a fiduciary from investing disproportionately in a particular investment or enterprise. In *In Re Unisys*, the Court set forth the Congressional Committee report on the Act's diversification provision, which provides:

> A fiduciary usually should not invest the whole or an unreasonably large proportion of the trust property in a single security. Ordinarily the fiduciary should not invest the whole or an unduly large proportion of the trust property in one type of security or in various types of securities dependent upon the success of one enterprise or upon conditions in one locality, since the effect is to increase the risk of large losses.

*In Re Unisys*, 74 F.3d at 438 (quoting H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. (1974).)

Here, Defendants admit that 55% of the Plan's assets were invested in UNUM Provident common stock. They admit that 37% of the Plan's assets were invested in a security known as "MFB NORTHRN INSTL FDS DIVERSIFIED GROWTH PORTFOLIO CL A." Under Section 1104(a)(1)(C), Defendants had a duty to diversify the investments of the plan so as to minimize the risk of large losses, "unless under the circumstances it is clearly prudent not to do so." Based on the above allocations, Defendants must demonstrate that nondiversification was nonetheless prudent. However, Defendants offer no explanation to support the above investment decisions. Indeed, Defendants admit that they knew nothing about these stocks. (*See* Charles Depo., pp. 46, 50–54, 56, 59, 64, 72–73, 75–76, 84, 92, 100–101, 123–24, 130–31; Frank Depo., pp. 14–18, 21–22, 27, 31, 33, 35, 39–41; John Depo., pp. 19–33, 37, 41–44, 49–53, 86, 91, 94, 97, 101–10109, 120, 131, 134.) Thus, this Court concludes that Defendants breached their fiduciary duties by failing to diversify the investments of the plan so as to minimize the risk of large losses.

## 2. Defendants have engaged in prohibited transactions with parties in interest

Plaintiff contends that Defendants have engaged in prohibited transactions with parties in interest. This Court agrees.

It is undisputed that Defendants' attempts to transfer Eleanor's interest in the Plan to her Estate were made to benefit Defendants' family members, as well as themselves. (*See* Exh. 58, p. 189; First Amended Answer, p. 2; Exh. 4; Exh. 6; Exh. 53, p. 73.) Section 1106 provides that the following are prohibited transactions:

(a) Transactions between plan and party in interest

. . . . .

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect -

. . . . .

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan;

. . .

(b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not -

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, . . . .

29 U.S.C. § 1106(a)(1)(D) and (b)(1)and (2). Thus, this Court concludes that Defendants' prohibited transaction are further breaches of their fiduciary duties.

### 3. Each of the Defendants is liable for the breaches of the other

 Plaintiff seeks a determination that each of the Defendants is liable for the breaches of the other fiduciaries. Section 1105 provides as follows:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a). The undisputed facts show that each Defendant failed to comply with Section 1104(a)(1), and in doing so, each Defendant enabled the other fiduciaries to commit a breach. Thus, this Court concludes that each Defendant is liable for the breaches of a co-fiduciary.

### 4. Restitution is warranted

 Section 1109 provides liability for breach of a fiduciary duty as follows:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

Here, Plaintiff seeks an order requiring Defendants to restore the Plan to its May 31, 1999 position. Specifically, Plaintiff seeks restitution of $814,818.19. In support of this amount, he relies on testimony from Linda Podhorski ("Podhorski"), the third party administrator retained by the Plan to provide administrative services to the Plan.[4] Podhorski produced the Plan's Annual Valuation as of May 31, 1999 and May 31, 2000. As of May 31, 1999, less than a month after Eleanor's death and after Defendants knew of her designation of Fred as her beneficiary, the Plan had assets of $1,919,525.13. (*See* Exh. 25, pp. 2–8.) A year later, the Plan had received an annual contribution of $54,356.20 by the Plan Sponsor, Weighmasters Murphy, Inc. (*See* Exh. 26, p. 26.) Therefore, the Plan assets, had they not been invested in anything that bore interest should have been not less than $1,973,881.33. However, as of May 31, 2000, despite the Plan Sponsor's contribution, the Plan assets totaled $1,159,063.14—a loss of $814,818.19. This loss is in excess of 40% of the total Plan assets.

---

4. Podhorski provided the calculations to Northern Trust which resulted in its deposit

of funds with this Court.

This Court concludes that restitution is appropriate equitable relief for Defendants' breaches of their fiduciary duties. *See Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 2064, 124 L.Ed.2d 161 (1993) ("And the text of ERISA leaves no doubt that Congress intended 'equitable relief' to include only those types of relief that were typically available in equity, such as injunction, mandamus, and restitution. Given ERISA's roots in the law of trusts, "equitable relief" could in theory mean all relief available for breach of trust in the common-law courts of equity ...."). "Where there has been a breach of fiduciary duty, ERISA grants to the courts broad authority to fashion remedies for redressing the interests of participants and beneficiaries." *Donovan v. Mazzola,* 716 F.2d 1226, 1235 (9th Cir.1983). Thus, Plaintiff is entitled to restitution in the amount of $814,818.19.

### 5. Pre-judgment interest is warranted

Plaintiff also seeks an order requiring Defendants to pay interest on the sums lost. This Court concludes that such interest is also appropriate.

> [I]t is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of prejudgment interest. (Citations omitted.) This includes the power to award interest at a rate that will put the [Pension Fund] in the position that it would have occupied but for the [trustees'] breach.

*Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984). Plaintiff contends that prejudgment interest of 16% is reasonable given that the stock market was in the midst of the greatest bull market in American history during the May 1999 through May 2000 period. This Court considers this request preposterous. Prior case law supports that prejudgment interest should be awarded in accord with prevailing interest rates. *See id.* Thus, this Court orders prejudgment interest to be computed on the monthly U.S. Treasury Bill average for the period May 3, 1999 through May 31, 2000.

### 6. Individualized equitable relief is warranted

This Court agrees with Plaintiff that once Defendants make restitution to the Plan, he is entitled to have the balance of the benefits disbursed, including interest thereon, to him. A plan participant or beneficiary may obtain any appropriate equitable relief for a fiduciary's breach of their duties and obligations. *See* 29 U.S.C. § 1132(a)(3). The Supreme Court has held that this section of ERISA authorizes lawsuits for individualized equitable relief for breach of fiduciary obligations. *See Varity Corp. v. Howe,* 516 U.S. 489, 491, 116 S.Ct. 1065, 1067, 134 L.Ed.2d 130 (1996). It found that granting individual relief is consistent with ERISA's language, structure and purpose. *See id.* Thus, because the Superior Court has already determined that Plaintiff is entitled to the benefits (*see* Exhs. 60 and 61), this Court concludes that Plaintiff is further entitled to the balance of such benefits, including interest, upon restitution to the Plan by Defendants.

### 7. Defendants improperly paid Plan expenses

 Plaintiff also seeks $12,992.54 which represents Plan expenses which were improperly paid by Defendants from Eleanor's interest in the Plan.

It is undisputed that Northern Trust retained the Law Firm of Reisch & Luftman to represent it in the Interpleader Action. Reisch & Luftman submitted bills in the amount of $12,992.54 for its representation. (*See* Exh. 58, pp. 36–38.) Northern Trust submitted these bills to

Charles, who instructed that Eleanor's interest in the plan be reduced by the amount of $12,992.54 so that the Plan Sponsor, of which Charles and his son and daughter are the sole owners, would not have to bear those legal bills. (*See* Exhs. 30, 31, 32, 34 and 55, pp. 54–57.) Eleanor's interest was actually reduced by the sum of $12,992.54 to pay the legal bulls submitted by Reisch & Luftman in the Interpleader Action. (*See id.*)

Under the Plan, the Plan Sponsor, Weighmasters Murphy, Inc., is required to pay the expenses incurred by the Plan. (*See* Exh. 1, Section 6.5.) However, by directing that the Reisch & Luftman expenses be paid from Eleanor's interest in the Plan, Defendants engaged in a prohibited transaction. *See* 29 U.S.C. § 1106(b). Thus, this Court concludes that Plaintiff is entitled to the sum of $12,992.54.

### 8. Removal of Defendants as fiduciaries is warranted

■ Based on the undisputed facts and foregoing analysis, this Court agrees with Plaintiff that removal of Defendants as fiduciaries is necessary. Section 1109 provides that such relief may be warranted for breaches of fiduciary duty. "[R]emoval of pension fund trustees and the appointment of a person to serve in their stead is appropriate under the statute when they have engaged in repeated or substantial violations of their responsibilities." *Katsaros,* 744 F.2d at 281 (internal quotations and citation omitted). Pursuant to this Court's equitable power, this Court concludes that removal of Defendants as fiduciaries is warranted. A qualified fiduciary should be appointed as a substitute fiduciary immediately.

### 9. An award of attorney fees and costs is warranted

■ Plaintiff seeks an award of his attorney's fees and costs. Section 1132(g) provides that a court in its discretion may allow reasonable attorney's fee and costs of action. *See* 29 U.S.C. § 1132(g). The Ninth Circuit has held that if a plan participant or beneficiary prevails in an action to enforce his rights, he ordinarily should recover attorney's fees in the absence of special circumstances making an award unjust. *See Smith v. Retirement Fund Trust,* 857 F.2d 587, 592 (9th Cir.1988). This Court can consider the following factors: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. *See id.*

■ The undisputed facts establish Defendants' culpability, and an award of fees would deter others from acting under similar circumstances. In addition, Plaintiff's success is indicative of the relative merits of each parties' position. Thus, considering the above factors, and in the absence of special circumstances, this Court concludes that Plaintiff is entitled to recover costs and reasonable attorney's fees. This Court will further determine the amount of reasonable attorney's fees upon a properly noticed motion supported by points and authorities, as well as the necessary documents and evidence.

### C. *Conclusion*

Accordingly, this Court **grants** Plaintiff Dan L. Springate's Motion for Summary Judgment.

IT IS SO ORDERED.